UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRUCE T. HENRIKSEN,                      )
      Plaintiff,                           )
                                           )
v.                                       )    **Case No.  02 C 8060**
                                           )    **Magistrate Judge Geraldine Soat Brown**
DETECTIVE JAMES PICARDI,                  )
#191, et al.,                            )
      Defendants.                          )
                                           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce T. Henriksen ("Henriksen") brought this action pursuant to 42 U.S.C. § 1983, alleging that police officers Thomas Shergold, Robert Beeter, Ronald Spejcher and James Picardi, and the City of Elgin (collectively, "Defendants"), violated Henriksen's constitutional rights when they "conspired to present false and wholly misleading testimony to the Grand Jury and at trial" and "failed to investigate 'routine evidence' at the scene of the crime." (Pl.'s 2nd Am. Compl. ¶¶ 60-64.) [Dkt 23.][1] Henriksen also alleges supplemental state law claims for malicious prosecution, false imprisonment, intentional infliction of emotional distress ("IIED"), and, against the City of Elgin only, a claim of *respondeat superior*. (*Id*. ¶¶ 65-86.) Defendants have moved for summary judgment.[2] [Dkt 63.] The parties have consented to the jurisdiction of a United States Magistrate

---

[1] Henriksen's Second Amended Complaint also includes an allegation that the Kane County Sheriff's Office and Correctional Medical Service, Inc. violated his civil rights by intentionally withholding necessary psychotropic medication from Henriksen while he was in custody. (2nd Am. Compl. ¶¶ 58-59.) Those defendants did not file a motion for summary judgment and, accordingly, this opinion does not discuss that claim.

[2] The motion was also brought on behalf of the Elgin Police Department, but the Department was dismissed as a defendant in February 2003 when Henriksen filed his Amended

Judge pursuant to 28 U.S.C. § 636(c). [Dkt 36-39.] For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part. It is granted as to Henriksen's § 1983 and conspiracy claims against the movants. With respect to Henriksen's supplemental state law claims, Defendants' motion is denied without prejudice.

## FACTUAL BACKGROUND[3]

In 1997 and again in 1999, Henriksen was charged with the murder of Doreen Drjanski. In 2001, Henriksen was acquitted after a jury trial. Henriksen's claim involves Defendants' investigation of the crime and testimony before the grand juries that indicted him. Some factual background is necessary to understand the basis of this lawsuit. Some of that factual background is undisputed. Other matters about Ms. Drjanski's murder are disputed and may never be resolved. However, what is relevant to the present claim is Defendants' investigation and testimony. A significant problem with the parties' presentation of the evidence, especially Henriksen's, is a failure

---

Complaint. [Dkt 15.]

[3] The following facts are taken from the parties' responses or replies to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ __" [dkt 71], "Defs.' LR Resp. ¶ __" [dkt 75], and Defs.' LR Reply ¶ __" [dkt 73], as well as from the exhibits submitted with those statements or responses to those statements, which are cited herein as: "Pl.'s LR Ex. __" [dkt 71] and "Defs.' LR Ex. __" [dkt 63]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1(b)(3).

Many of the exhibits submitted with the parties' briefs were missing pages that had been cited in the briefs. After the court called this fact to the parties' attention, the parties submitted more complete copies of exhibits, and Henriksen submitted a "Second Amended Response," which contained the same brief as his previously filed Amended Response. [*See* dkt 85, 86, 87.] For the sake of simplicity, the court will refer to all of the exhibits as "Pl.'s LR Ex. __" and "Defs.' LR Ex. __," regardless of whether those exhibits were submitted with initial briefs or amended briefs, and will refer to the parties' briefs as "Defs.' Am. Mem.," "Pl.'s Am. Resp.," and "Defs.' Am. Reply," respectively.

to differentiate between what Defendants knew at the relevant times and what Henriksen believes to be the truth or what appears to be true in hindsight.

## A.     Henriksen and Doreen Drjanski

Henriksen met Doreen Drjanski in approximately October 1996 at the Elgin Mental Health Center, where he was a patient obtaining treatment for his bipolar disorder.  (Pl.'s LR Resp. ¶ 1; Defs.' LR Ex. B, Henriksen Dep. at 65.)  Ms. Drjanski was also a patient at the Elgin Mental Health Center.  (Defs.' LR Ex. J, 2nd Grand Jury Proceeding Trans. at 7.)  Shortly after they met, Ms. Drjanski began renting a room in Henriksen's home, and the two began a sexual relationship that lasted a few months.  (Pl.'s LR Resp. ¶ 1.)  One other tenant, Daniel Fluellen, also lived in Henriksen's home during this time period.  (Pl.'s LR Ex. J, Shergold Report.)

Henriksen testified that he cared for Ms. Drjanski and tried to make sure that she took her medication.  (Defs.' LR Resp. ¶ 99.)  During their relationship, Ms. Drjanski "'broke[] her word' to him" by refusing to take her medication and engaging in prostitution.  (Pl.'s LR Resp. ¶ 2; Defs.' LR Resp. ¶ 100.)  According to Henriksen, he ended the sexual relationship with Ms. Drjanski after approximately two months, or around December 1996, because he was involved with another woman. (Pl.'s LR Resp. ¶¶ 1, 2; Defs.' LR Resp. ¶ 98.)

In early January 1997, Henriksen told Ms. Drjanski several times to leave his home, and he eventually sought the assistance of the Elgin Police Department to try to have her removed from his home.  (Pl.'s LR Resp. ¶ 3.)  Henriksen also spoke with Ms. Drjanski's father, her brothers and a co-worker about his desire to have her leave his home and the problems he was having with her, including her failure to take her medication.  (Pl.'s LR Resp. ¶ 4; Defs.' LR Resp. ¶ 99.)  According

to Henriksen, Ms. Drjanski was scheduled to move out voluntarily by the end of January. (Defs.' LR Resp. ¶ 100.) However, on January 22, 1997, three months after she had moved into Henriksen's home, Ms. Drjanski was found murdered there. (Pl.'s LR Resp. ¶¶ 1, 6, 8.)

## B.    Investigation Into the Events Surrounding Ms. Drjanski's Murder

On January 22, 1997, at around 7:30 or 7:45 a.m., Henriksen went to his job at Arlington Nissan where he was a car salesman and told his general manager, James Johnson, that he "need[ed] [his] paycheck right now." (Pl.'s LR Resp. ¶¶ 5, 6.) In an interview following Henriksen's arrest, Mr. Johnson told investigators, and later testified at trial, that Henriksen looked "ghostly" in color, was unshaven and was poorly dressed. (*Id*. at ¶ 6.) According to one of the police reports subsequently filed, Mr. Johnson stated that it appeared that Henriksen was going to "gang tackle" him that morning. (Defs.' LR Ex. Z, Shergold Report at BH-48; Pl.'s LR Stmt. ¶ 50; Defs.' LR Resp. ¶ 50.) Henriksen left work but returned at around 11:30 a.m., at which time he advised Mr. Johnson that he was quitting his job and asked when he could pick up his final paycheck. (Pl.'s LR Resp. ¶¶ 5, 6.) According to Henriksen, he then returned home, where he saw Ms. Drjanski sitting on her bed smoking a cigarette. (Pl.'s LR Resp. ¶ 7.) Approximately 30 to 45 minutes later, Henriksen left his home to run errands. (*Id.*; Defs.' LR Ex. B, Henriksen Dep. at 101.)[4] After running errands, Henriksen went to his mother's home in Elgin where he stayed from approximately 5:00 p.m. to 7:45 p.m. before returning home again. (Pl.'s LR Resp. ¶ 7.)

_____

[4] Defendants' Statement of Undisputed Facts states that Henriksen: (1) returned to work around 11:30 a.m. (Defs.' LR Stmt. ¶ 6), (2) then returned home, arriving at approximately 11:00 a.m. (*Id*. at ¶ 7), and (3) then left his home to run errands at around 11:30 a.m. (*Id*.) Although those facts do not flow chronologically, they are undisputed, and they correspond to deposition testimony in the record. (Pl.'s LR Resp. ¶¶ 6, 7.) However, the discrepancy is not material to the outcome of this motion.

Henriksen testified that upon arriving home, he found his back door ajar, but did not see any sign that it had been forced open, nor any sign that any windows had been forced open. (*Id*. at ¶ 8.) Shortly thereafter, Henriksen discovered Ms. Drjanski's body lying motionless on her bed. (*Id*.) He noticed a small amount of white foam coming from her mouth and faint purple marks on both sides of her throat and neck. (*Id*.) He performed CPR on Ms. Drjanski for a short time before calling 911. (*Id*. at ¶ 9.) Henriksen told the operator that he wanted to report a murder and that it looked like Ms. Drjanski had been choked. (*Id*.) Approximately three minutes later, Elgin police officers arrived at Henriksen's home and began investigating the crime. (*Id*. at ¶ 10.)

## C. The Elgin Police Department's Investigation

### 1. The Interview of Henriksen

Henriksen was interviewed by detectives James Picardi and Robert Beeter on the evening of the murder. (*Id*. at ¶ 18.) During that interview, Henriksen told the officers essentially the same information described above about his relationship with Ms. Drjanski, quitting his job on that day and returning home after being at his mother's house. (*Id*.) He also said that when he arrived home he found the rear door ajar even though he had a practice of keeping the doors locked while he was gone. (*Id*.; Defs.' LR Resp. ¶¶ 3, 5.) Henriksen did not provide the police with the names of any witnesses who could corroborate his whereabouts between 1:00 p.m. and 5:00 p.m. on the day of the murder. (Pl.'s LR Resp. ¶ 19.)

### 2. Detective Beeter's Investigation

Detective Beeter, who was the first detective to arrive at the murder scene, found no signs

of forced entry through either the doors or the windows. (*Id.* at ¶ 13; Defs.' LR Resp. ¶ 1.) Beeter testified that there was no evidence to suggest that someone who had been in the residence had left the door open. (Defs.' LR Resp. ¶ 5.) Beeter believed that evidence that the door had been left open was not necessarily an indication that anyone had entered the home after Henriksen had left because Ms. Drjanski could have opened the door herself. (Pl.'s LR Resp. ¶ 13.)

Beeter conducted an interview of Henriksen's mother, Lynn Maxwell. Ms. Maxwell stated that Henriksen had come to her home that evening after 5:00 p.m. and stayed for dinner. (*Id.* at ¶ 14.) Beeter also interviewed a neighbor, Barbara Miller. Ms. Miller told Beeter that two weeks before the murder she had witnessed Henriksen kissing a woman outside his home. (Defs.' LR Resp. ¶ 4.) Beeter testified that he did not ask Ms. Miller who the woman was or whether she was Ms. Drjanski, because he did not see the significance of it. (*Id.*)

Beeter was unable to verify with any witnesses Henriksen's whereabouts between noon and 5:00 p.m. (Pl.'s LR Resp. ¶ 14.) Beeter filed a report indicating that Henriksen had told police that he had been at his mother's home between 5:00 and 7:45 p.m., which Beeter had confirmed with Henriksen's mother. (*Id.* at ¶ 33.) Beeter further stated in his report that when Henriksen returned home he had found his door partially opened, and that he always kept his doors closed and locked. (*Id.* at ¶ 34.)

### 3.     Detective Picardi's Investigation

The lead detective in the case, defendant James Picardi, testified at his deposition that when he arrived at the scene, there was foam coming out of Ms. Drjanski's mouth and purplish marks on

her neck. (Defs.' LR Resp. ¶¶ 14, 16.)[5] Picardi's report documented that "it should be noted that the area around the neck of [Ms. Drjanski] and her hands appeared to be somewhat discolored." (Pl.'s LR Resp. ¶ 16.)

Picardi testified, also at his deposition, that DNA tests were conducted on the matter scraped from under Ms. Drjanski's fingernails but no attempt was made to match this DNA with Henriksen's DNA. (Defs.' LR Resp. ¶ 18; Pl.'s LR Ex. C, Picardi Dep. at 31-32.) Picardi testified that he attempted to locate fingerprints on the open rear door shortly after his arrival by shining a flashlight on the door, but did not see any and therefore did not ask the evidence technician to dust the door for prints. (Defs.' LR Resp. ¶ 20.)[6] Although Henriksen had told Picardi that Ms. Drjanski was a prostitute, he did not follow up on that information with anyone other than Henriksen, and did not attempt to locate Ms. Drjanski's address book. (*Id.* at ¶ 15.) Picardi testified that he never conducted any investigation into Ms. Drjanski's ex-husband, with whom Ms. Drjanski was engaged in a custody dispute, because there was nothing to indicate that he had anything to do with the murder. (*Id.*)

### 4. Officer Spejcher's Investigation

Officer Ronald Spejcher, an evidence technician, was responsible for photographing and collecting evidence at the scene. Spejcher collected and preserved three empty bottles of Red Bull beer, one cigarette butt found on Ms. Drjanski's sweater, a hair fiber, a change purse containing

---

[5] As the lead detective, Picardi was responsible for collecting reports, maintaining the case file, and making contact with the prosecutor, among other things. (Defs.' LR Resp. ¶ 14.)

[6] Henriksen's Statement of Facts states that "Picardi testified that he attempted to locate latent *photographs* on the door shortly after his arrival by shining a flashlight at the door." (Pl.'s LR Stmt. ¶ 20) (emphasis added). It is assumed that the statement intended to say "fingerprints."

$170, prescription bottles, bedding material, and fibers found on the bed. (Pl.'s LR Resp. ¶ 11; Defs.' LR Resp. ¶¶ 41, 42.) Those items were placed in a sealed envelope and kept in the police evidence room. (Pl.'s LR Resp. ¶ 11.) Spejcher prepared a report referring to the items taken from the scene that had been placed in evidence. (*Id*. at ¶ 35.)

Spejcher testified that he had the authority to order a DNA test conducted on the cigarette butts, but that Picardi had told him that he would take care of any lab requests. (Defs.' LR Resp. ¶ 44.) Spejcher testified that he likely would have ordered DNA testing, although he did not think the cigarette butts were connected to the crime. (*Id*.) Spejcher did not collect various cigarette butts found in a coffee cup near Ms. Drjanski's body because he did not believe they were connected to the crime either. (Pl.'s LR Resp. ¶ 11; Defs.' LR Resp. ¶ 43.) Nor did he take any fingerprints from the murder scene. (Pl.'s LR Resp. ¶ 12; Defs.' LR Resp. ¶ 45.)

### 5.    Other Investigative Actions

Detective Ray Rodriguez, a fingerprint specialist, also reported to Henriksen's home on the night of the murder. Rodriguez observed discoloration on Ms. Drjanski's neck, which he concluded was a postmortem artifact caused by lividity or pooling of the blood after death. (Pl.'s LR Resp. ¶ 12.) Rodriguez attempted to take fingerprints off Ms. Drjanski's body with a forensic light source. (*Id*.; Defs.' LR Ex. L, Rodriguez Trial Testimony at 145.) Rodriguez did not examine the beer bottles in the room for fingerprints. (*See* Defs.' LR Resp. ¶¶ 19, 21; Picardi Dep. at 34.)

Officer Miklitsch reported to Henriksen's home on the night of the murder as well, and interviewed some of Henriksen's neighbors. (Pl.'s LR Resp. ¶ 15.) According to his report, Miklitsch spoke with Henriksen's neighbor, Harry Potter, who saw a woman he had never seen before enter the side door of Henriksen's home without a key at around 1:00 p.m. on the day of the

murder.  (*Id*.; Defs.' LR Resp. ¶ 24; Defs.' LR Ex. Q, Miklitsch Report.)  Picardi testified that he did not really consider the information regarding the unknown woman to be a lead and did not investigate to find out who this woman was because he assumed it was Ms. Drjanski.  (Defs.' LR Resp. ¶ 24; Pl.'s LR Ex. C, Picardi Dep. at 62.)

Officer Copeland, another officer who visited the murder scene, prepared a report documenting, as other officers had, that there were "very faint purple marks on [Ms. Drjanski's] neck." (Pl.'s LR Resp. ¶ 16.)

### 6.     The Medical Examiner's Examination

Ms. Drjanski's body was taken to a medical examiner, Dr. Cogan, for further examination. Picardi's report noted that, before conducting the internal examination, Dr. Cogan identified petechial[7] hemorrhages, and stated that such hemorrhages are common in deaths caused by strangulation.  (Pl.'s LR Resp. ¶ 17.)   After an internal examination, Dr. Cogan determined that Ms. Drjanski had died of strangulation.  (Pl.'s LR Ex. N, Dr. Cogan's Report at 3; Def.'s LR Ex. G, First Grand Jury Trans. at 5-6.)

### D.     Henriksen's Admission to Donald Harrison

Donald Harrison, Ms. Drjanski's father, gave a statement to Picardi on January 24, 1997, which was recorded on January 25, 1997 and transcribed.  (Pl.'s LR Ex. D, Suppl. Police Report at SAO-30, SAO-32-33.)  Mr. Harrison told Picardi that on the night of the murder, Henriksen called

---

[7] "Petechial" is defined by *Dorland's Illustrated Medical Dictionary* 1363, (29th ed., W.R. Saunders Co. 2000) as "characterized by...petechiae."  A "petechia" (pl., "petechiae") is a "pinpoint, nonraised, perfectly round, purplish red spot caused by intradernal or submucous hemorrhage."  *Id.*

Harrison and stated, "she got violent," and "she's gone," before explaining to Harrison that Ms. Drjanski was dead. (Defs.' LR Resp. ¶ 29.) Mr. Harrison said that he told Henriksen to call 911 and that he would come over. (*Id.*) Mr. Harrison called 911 afterwards and told the operator that someone might be having a "physical problem." (Defs.' LR Ex. T, Trans. of 911 call at 39; *see* Defs.' LR Resp. ¶ 34.) Mr. Harrison also asked the operator to let him know what happened as soon as she heard back from the officers at the scene, because he would "have to come out there." (Defs.' LR Ex. T, Trans. of 911 call at 40; Defs.' LR Resp. ¶ 34.) Mr. Harrison never went to Henriksen's house that night. (Defs.' LR Resp. ¶ 34.) Mr. Harrison's wife stated that she and her husband may have consumed alcoholic beverages that night. (*Id.* at ¶ 74.) She further testified that it never occurred to her to go to Henriksen's house as she was in a state of turmoil and probably could not drive. (*Id.* at ¶ 76.) Henriksen testified that Mr. Harrison sounded intoxicated when they spoke that night. (*Id.* at ¶ 91.)

Mr. Harrison told Picardi that he spoke with Henriksen again the next day, and told Henriksen that he was sorry Henriksen had to go through this, sorry for his daughter, and sorry that they had to suffer a second death in the family. (Pl.'s LR Stmt. ¶ 30; Defs.' LR Ex. E, Harrison Stmt. at 436.) (Mr. Harrison's son had committed suicide earlier that year). (Defs.' LR Ex. E, Harrison Stmt. at 427.) The following day (two days after the murder, January 24, 1997), Henriksen spoke to Mr. Harrison again. Mr. Harrison told Picardi that Henriksen said that he "did it," and he "put her out of her misery," in reference to Ms. Drjanski's murder. (Pl.'s LR Resp. ¶ 21; Defs.' LR Resp. ¶ 31.) Mr. Harrison told Picardi that he never explored Henriksen's alleged admission, explaining that both he and Henriksen felt sorry for each other. (Defs.' LR Resp. ¶ 36.) Telephone records verified that two phone calls were made from Henriksen's home to Harrison's home that day

(January 24, 1997).  (Pl.'s LR Resp. ¶ 21; Defs.' LR Resp. ¶ 33.)[8]

Mr. Harrison also told police that he had made plans to meet Henriksen at Henriksen's home at 11:00 a.m. on January 25 to collect clothes in which to bury Ms. Drjanski.[9]  (Defs.' LR Resp. ¶¶ 32, 77, 85.)  Picardi testified at his deposition that he found that behavior unusual, but explained that the Harrisons were not "normal people."  (Defs.' LR Resp. ¶ 37.)


### E.      Henriksen's Arrest

On January 25, 1997, the State's Attorney for Kane County filed a Complaint for Preliminary Hearing charging Henriksen with Ms. Drjanski's murder.  (Defs.' LR Ex. N.)  The Complaint appears to have been signed and verified by Sergeant Mark Brictson, who is not one of the defendants in this lawsuit.  (Id.)[10]  The verification refers to a "foregoing Information" but the record does not contain any affidavits or information that may have been filed in support of the arrest warrant.  (Id.)  The lower half of the form reflects that a Kane County judge made a finding of probable cause to arrest Henriksen, and ordered an arrest warrant to issue on January 25, 1997.  (Id.) The document signed by the judge was filed by the State's Attorney on January 27, 1997.  (Id.) Apparently, Henriksen was arrested on January 26, 1997,  pursuant to the arrest warrant.  (Pl.'s LR Ex. D at SAO 33; cf. Henriksen's Dep. at 85 (stating that he was arrested on the day he arrived home

---

[8]  The first call lasted 19 minutes and 16 seconds, and the second call lasted 51 seconds. (Pl.'s LR Resp. ¶ 21; Defs.' LR Resp. ¶ 33.)

[9]  Mr. Harrison testified he and his wife and two others drove to Henricksen's house on January 25 but that Henricksen did not show up.  (Defs.' LR Resp ¶ 85.)

[10]  Although the signature on the Complaint is not entirely legible, it appears to be "Brictson." A supplemental police report filed on February 14, 1997 notes that a Sergeant Brictson obtained the arrest warrant for Henriksen on January 25, 1997.  (Pl.'s LR Ex. D, Suppl. Police Report at SAO-32-33.)  The sergeant's star number, 78, is not the star number of any of the defendants in the case.  (Defs.' LR Ex. N.)

from New Mexico, which was "the 27th").

**F.      Sergeant Shergold's Supplemental Police Reports**

On January 30, 1997, after Henriksen had been arrested, Sergeant Shergold interviewed Henriksen's boss, James Johnson, at the Arlington Nissan dealership and included his interview in a supplemental report. (Defs.' LR Ex. Z, Shergold Report at BH-47-49.) In the report, Shergold documented Mr. Johnson's statements, discussed above. (*Id.* at BH-48; Pl.'s LR Stmt. ¶ 50; Defs.' LR Resp. ¶ 50.)

Sergeant Shergold also interviewed one of Henriksen's co-workers, Al Smith, and included that interview in his report, as well. (Defs.' LR Resp. ¶ 47.) According to the report, Henriksen had told Mr. Smith that he was in love with Ms. Drjanski, that they had frequent sexual activity, that she was "screwing around" on him, that he was going to kill the guy with whom she was involved, and that he (Henriksen) had a gun. (*Id.* at ¶¶ 47, 48; Defs.' LR Ex. Z, Shergold Report at BH-48; Pl.'s LR Ex. G, Shergold Dep. at 34-35.) Mr. Smith further stated, according to Shergold's report, that he was concerned about Henriksen's mental state and thought he might be suicidal. (Defs.' LR Resp. ¶ 47; Defs.' LR Ex. Z, Shergold Report at BH-48.) As discussed below, at his deposition in this case in October 2003, Mr. Smith contradicted certain aspects of Shergold's report of the interview.

Shergold later interviewed Henriksen's other tenant, Mr. Fluellen, as part of his investigation. (Defs.' LR Resp. ¶ 51; Pl.'s LR Ex. J, Shergold Report.) Mr. Fluellen told Shergold that he had been out of town between January 3, 1997 and February 2, 1997. (Pl.'s LR Ex. J, Shergold Report at 1.)

**G.     Reports Provided to the Prosecutor and Defense Attorney**

Picardi provided all police reports and information gathered from the investigation, including a list of all items that had been preserved in evidence by the Elgin police, to the Kane County prosecutor. (Pl.'s LR Resp. ¶ 20.) The police reports documented, *inter alia*, Henriksen's statement that Henriksen was at his mother's home on the evening of the murder, Officer Miklitsch's report that Mr. Potter had seen a woman enter Henriksen's home at 1:00 p.m. that day without a key, and various reports indicating that visual marks could be seen on Ms. Drjanski's body. (*Id*. at ¶¶ 15, 19, 20, 49b.)

Henriksen's attorney, Regina Harris, a criminal defense attorney with 16 years of experience, was also given copies of police reports and information gathered from the investigation. (Pl.'s LR Resp. ¶¶ 30, 32-35, 48, 50; Defs.' LR Ex. V, 8/20/04 Harris Dep. at 13-14, 16-22, 46-47, 65.) Harris received, *inter alia*, Beeter's report which included Henriksen's statement that he had been at his mother's home on the evening of the murder and found his door partially opened when he returned home (Pl.'s LR Resp. ¶¶ 33, 34), and Spejcher's report regarding items taken from the scene (*Id*. at ¶ 35). Harris never accused the prosecutor of not providing her with all reports or other physical evidence that was exculpatory in nature. (*Id*. at ¶ 32.) Indeed, Harris testified at her deposition in this case that she had obtained "everything" from the prosecutor as far as she knew. (*Id*.; Defs.' LR Ex. V, 8/20/04 Harris Dep. at 46.) Harris also never challenged the authenticity or accuracy of the 911 tape's transcript. (Pl.'s LR Resp. ¶ 9.) Harris could have tested for fingerprints any of the items taken from the crime scene. (*Id*. at ¶ 35.) Harris determined that she had no reason to believe that Ms. Drjanski's ex-husband was involved in the murder, as she found nothing in their relationship demonstrating the level of animosity that would require the police to investigate the husband as a

potential suspect. (*Id*. at ¶ 39.) Harris also did not consider relevant the neighbor's statement in Beeter's report that he had seen Henriksen kissing a woman in front of his home two weeks before the murder. (*Id*. at ¶ 40.) Harris never located any witnesses, receipts or other evidence to corroborate Henriksen's statements regarding his whereabouts between 11:00 a.m. and 5:00 p.m. on the day of the murder. (*Id*. at ¶ 36.)

## H.    The First Grand Jury Proceeding

The Kane County State's Attorney presented the case to a grand jury at a session on February 21, 1997 at which Picardi testified. (*Id*. at ¶ 24.) Henriksen admits that Picardi was not the complaining witness and did not tell the prosecutor what questions to ask at the hearing or what information would be put before the grand jury. (*Id*. at ¶ 25.) Picardi also had no input into deciding what information would be put before the grand jury. (*Id*. at ¶¶ 24, 25.)

On February 24, 1997, the grand jury returned an indictment against Henriksen for Ms. Drjanski's murder. (Pl.'s LR Resp. ¶ 29; Defs.' LR Ex. O.) Thereafter, on September 2, 1997, Henriksen's attorney Harris filed a motion to dismiss the indictment on the ground that Picardi's testimony before the grand jury was contradicted by statements made in the police reports. (Pl.'s LR Resp. ¶¶ 30, 43, 49, 50.) Harris' motion argued the following:

- •    Picardi testified that Henriksen indicated to the 911 operator that Ms. Drjanski "had been strangled," when in fact he stated that "she looked like she was choked to death" (*Id*. at ¶ 49a);

- •    Picardi testified that there were no signs on Ms. Drjanski's body that she had been strangled, when multiple police reports actually indicated that there were visual marks on Ms. Drjanski's body that could be perceived as evidence of strangulation, including: Picardi's report indicating that the area around her neck and her hands appeared somewhat discolored; Beeter's report that a small amount of foam was coming from her mouth and there was

distinct discoloration on the skin near her hands, shoulder and back of neck; and Copeland's report noting very faint purple marks on her neck (*Id.* at ¶¶ 45, 49b);

- Picardi testified that the medical examiner could not immediately determine the cause of death from an external examination, when Picardi's own report stated that Dr. Cogan had told Picardi before his internal examination that he observed petechial hemorrhages which were common in deaths caused by strangulation (*Id.* at ¶¶ 46, 49c);

- Picardi testified that there were no signs of forced entry, although Henriksen advised the 911 operator that he found his back door open when he arrived home, Officer Hernandez's report stated that fact, and Officer Miklitsch's report stated that Mr. Potter, Henriksen's neighbor, observed a woman entering Henriksen's home on the day of the murder without a key (*Id.* at ¶¶ 47, 48, 49d); and

- Picardi testified, in response to a grand juror's question, that Henriksen at no time tried to give an alibi or anything of that nature, although Beeter's report indicated that Henriksen had told him of his whereabouts during the day and Henriksen's mother confirmed that Henriksen was at her home between 5:00 and 7:45 p.m. (*Id.* at ¶¶ 44, 49e).[11]

Apparently there was no adjudication of Harris' motion because the prosecutor voluntarily dismissed the first indictment. (*Id.* at ¶ 51.) The record is not clear when that dismissal occurred or what happened to Henriksen at that point, although there is some suggestion that he was hospitalized for mental problems. (Pl.'s LR Ex. W, Richard Abrams, M.D., Aff. ¶ 12.)

---

[11]At his deposition, Picardi explained his grand jury testimony that Henriksen never tried to give an alibi as based on his understanding that an alibi is specific information corroborated by a witness which could prove that the suspect was not involved in the crime, and Henriksen's presence at his mother's house in the evening did not account for his whereabouts during the remainder of the day. (Pl.'s LR Resp. ¶ 27; Defs.' LR Resp. ¶ 26; Defs.' LR Reply ¶ 26.) Picardi also explained that he did not tell the grand jury about the purple marks he saw on Ms. Drjanski's neck or the foam coming out of her mouth, or Dr. Cogan's statement that petechial hemorrhages evidencing strangulation could be observed on Ms. Drjanski, because those questions were never asked of him. (Defs.' LR Resp. ¶ 23; Defs.' LR Stmt. ¶ 26; Pl.'s LR Resp. ¶ 26.) Nor did Picardi advise the grand jury of Henriksen's report that the back door had been found slightly ajar. (Defs.' LR Stmt. ¶ 26; Pl.'s LR Resp. ¶ 26.)

I.    **The Second Grand Jury Proceeding**

In approximately June of 1998, eighteen months after the first grand jury proceeding, the prosecutor moved to re-indict Henriksen after Timothy Larcker, Henriksen's cell mate at Kane County Jail, stated that Henriksen told him he had strangled Ms. Drjanski to death.  (Pl.'s LR Resp. ¶ 54.)[12]  At the second grand jury proceeding held on January 19, 1999, Picardi testified that:

- Henriksen told the 911 operator that it "appeared that [Ms. Drjanski] had been choked to death"; and that Ms. Drjanski had foam coming out of her mouth and marks on her skin;

- There were no marks on Ms. Drjanski's body that were obvious to Picardi;

- Dr. Cogan, the medial examiner, told Picardi that during his external examination he observed physical signs indicative of either strangulation or drug overdose;

- A side door near the driveway of Henriksen's home was found partially open, and there was no indication that anything had been used to open that door other than a key; and police never determined whether the door had been locked or unlocked;

- Henriksen made statements to police regarding his whereabouts at the time of the offense;

- Henriksen told police that he had visited his mother that afternoon and evening, and Henriksen's mother told police that Henriksen had visited her and they had dinner together;

- Henriksen never made any admission to any police officers regarding Ms. Drjanski's death;

- Henriksen and Ms. Drjanski had been engaged in a romantic relationship which ended some time prior to the murder;

- Henriksen owned and resided at the residence where Ms. Drjanski's body was found;

---

[12]  Larcker testified about the matter subsequently at a hearing in a case called *People v. Larcker*.  (Pl.'s LR Resp. ¶ 54.)

- A couple of days after the murder, Henriksen called Mr. Harrison and told him that he had put Ms. Drjanski out of her misery; and

- While incarcerated at Kane County Jail, Henriksen made admissions to Timothy Larcker, his cell mate, regarding the death of Ms. Drjanski.

(Defs.' LR Ex. J, 2nd Grand Jury Trans.; Pl.'s LR Resp. ¶ 52; Defs.' LR Resp. ¶¶ 25, 27, 28.) Picardi did not mention Mr. Potter's observations about the woman who entered the house without a key on the day of the murder because he was not asked about that. (Defs.' LR Resp. ¶ 25.) Picardi also did not testify about the purple marks that he himself observed on Ms. Drjanski's neck. (*Id*. at ¶ 28.) In addition, Picardi did not state that Larcker was a four-time convicted felon and drug addict who gave his testimony in exchange for being placed in a drug treatment program; Picardi stated that Larcker was in jail for theft. (*Id*. at ¶ 39.)

On February 11, 1999, the second grand jury returned an indictment against Henriksen. (Defs.' LR Ex. P.) Harris reviewed a transcript of the second grand jury proceeding and did not move to dismiss the indictment because, in her opinion, "there was nothing that was substantially inaccurate or falsified or mistaken in this testimony as compared to the first one." (Pl.'s LR Resp. ¶ 53.)

**J.      The Trial and this Lawsuit**

At his criminal trial in April 2001, Henriksen was found not guilty and, in the opinion of his attorney, received a fair trial. (Defs.' LR Ex. V, 8/20/04 Harris Dep. at 50; Pl.'s LR Resp. ¶ 57; *see also* Pl.'s LR Ex. U, Trial Trans.) Henriksen filed this lawsuit on November 7, 2002.

**LEGAL STANDARD**

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. ¶. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id*. *See also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (*i.e.*, admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support

of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

### I. Henriksen's § 1983 claim

Henriksen's presentation of his claims, in both his Second Amended Complaint and in his response to the motion for summary judgment, is confusing. For example, the Second Amended Complaint begins with a two page narrative "Introduction" before beginning the numbered paragraphs. *See* Fed. R. Civ. P. 10(b) (requiring that averments of claim or defense be made in separately numbered paragraphs). Likewise, Henriksen's response to the motion consists in large part of speculation about Defendants' motives and unsupported assertions about what a "reasonable officer" would do. (*See, e.g.*, Pl.'s Resp. at 14-15.)

Liberally construing Henriksen's Second Amended Complaint, and taking into account the parties' arguments in their briefs, it appears that Henriksen claims that Defendants violated his due process right to a fair trial by withholding exculpatory evidence, fabricating inculpatory evidence and failing to conduct a sufficient investigation, and that Defendants' actions resulted in Henriksen's arrest and prosecution without probable cause in violation of the Fourth Amendment.[13] Additionally,

---

[13] Henriksen's malicious prosecution claim (Count II of the Second Amended Complaint) is presumably brought under Illinois state law because malicious prosecution is not a constitutional tort where the state already provides a remedy for malicious prosecution, as Illinois does. *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001). The existence of a state-law tort remedy "knocks out" any constitutional tort under due process for the same conduct. *Id.* at 751.

he claims that Defendants conspired to violate his constitutional rights.[14]

Defendants argue that they are entitled to summary judgment on Henriksen's § 1983 claims because: (1) probable cause is an absolute defense, and the second grand jury indictment as well as the facts known to police established probable cause (Defs.' Am. Mem. at 4-9); (2) Defendants' conduct did not constitute due process violations because there was no proximate cause between the alleged false reports and the prosecution, Henriksen was ultimately acquitted, and there is no constitutional duty to investigate a crime thoroughly (*id*. at 9-17); and (3) Defendants are shielded from civil tort liability under the qualified immunity doctrine (*id*. at 18-20). Defendants also argue that as an individual defendant Picardi has absolute immunity for his grand jury testimony. (*Id*. at 19.) Henriksen does not dispute that contention, but argues that Henriksen's claims against Picardi are rooted in his arrest and continued confinement of Henriksen. (Pl.'s Am. Resp. at 19-20.)

## A.     Applicable Constitutional Principles

Henriksen's major complaint seems to be that Defendants failed to follow up on potential leads that might have led to other suspects. He cites, for example, the failure to inventory or test the cigarette butts found in at the murder site, or to check out some of the telephone numbers in Ms. Drjanski's address book, or to interview her ex-husband. (Pl.'s Am. Resp. at 6-7.) There is a right not to be arrested without probable cause. *Humphrey v. Staszak*, 148 F.3d 719 (7th Cir. 1998). However, there is no due process right to a full and complete police investigation. *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1025 (N.D. Ill 2003) (stating that "it is clear that police are not constitutionally obligated to pursue all investigative possibilities to establish probable cause"); *see*

---

[14]As discussed, *supra*, n. 1, this opinion does not consider Henriksen's civil rights claim alleging deliberate indifference to his medical needs.

*also Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 442 (7th Cir. 1986) (stating that "the Constitution does not require police to follow the best recommended practices"). As the Seventh Circuit has made clear, "the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage, even if ideally that might appear to be a more desirable approach." *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) (citation omitted); *see also Gramenos*, 797 F.2d at 439, 442 (stating that "[t]here is no constitutional or statutory requirement that before an arrest can be made the police must conduct a trial" and that "the police need not automatically interview available witnesses, on pain of the risk that a jury will require them to pay damages"(citation omitted)); *Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir. 1986) (stating that the police "have no constitutional duty to keep investigating a crime once they have established probable cause" and that, therefore, the defendant had no duty to investigate thoroughly); *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989) (stating that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence").

There is also a due process right to a fair trial, and a plaintiff may have a claim under § 1983 if officers withhold information necessary to conduct a fair and impartial trial as guaranteed by the Constitution. In *Newsome v. McCabe*, the Seventh Circuit held that police officers who withhold material exculpatory evidence from a prosecutor or fabricate inculpatory evidence violate the due process clause and are subject to suit under § 1983, as such conduct constitutes a constitutional tort that threatens an individual's right to a fair trial. 256 F.3d at 752 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).[15] Thus, *Newsome* "links the police officer's duty to disclose exculpatory evidence

---

[15] A *Brady* violation occurs when the government withholds evidence that, had it been disclosed, creates a reasonable probability that the result of the trial would have been different.

to the prosecutors with the criminal defendant's right to a fair trial, essentially applying the obligations of prosecutors outlined in *Brady* to police officers." *Gregory v. Oliver*, 226 F. Supp. 2d 943, 953 (N.D. Ill. 2002). Additionally, the officer's omissions must have been material to the outcome of the proceeding, that is, there must be a "reasonable probability" that the exculpatory evidence withheld could have affected the outcome of the plaintiff's criminal trial. *Carroccia*, 249 F. Supp. 2d at 1023 (citing *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)).

The recent decision by the Seventh Circuit in *Alexander v. City of South Bend*, 433 F.3d 550, 552 (7th Cir. 2006), involved a § 1983 claim alleging a flawed criminal investigation and wrongful conviction. The court observed that "flawed identification procedures are not themselves constitutional violations; plaintiffs must show *how* those flawed procedures compromised the constitutional right to a fair trial." *Id.* at 555 (emphasis in original). Summary judgment for the defendants was affirmed in *Alexander* because the plaintiff failed to demonstrate the specific way in which the allegedly flawed investigation prevented a fair trial.

> A plaintiff with this kind of claim must demonstrate, by reference to the *Brathwaite* [*Manson v. Brathwaite*, 432 U.S. 98 (1977)] standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial. . . . Simply saying that a witness was shown a suggestive photo array or lineup and later testified is not enough.

*Id*.

Henriksen does not claim that Defendants concealed any information from the prosecutors or from his defense attorney. Henriksen's claims appear to be that Picardi misstated evidence in his testimony before the first grand jury, that Shergold fabricated parts of Mr. Smith's statement, that Defendants failed to disclose doubts about Mr. Harrison's credibility, and that they failed to pursue

---

*See Ienco v. Angarone*, 291 F. Supp. 2d 755, 760 (2003) (citing *Brady*, 373 U.S. at 87; *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)).

other leads.  The evidence fails to demonstrate any constitutional violation.

**B.      Henricksen's Initial Arrest**

Henriksen argues that Defendants' actions resulted in his being arrested and confined without probable cause.  (Pl.'s Am. Resp. at 19-20.)  In order to prevail on a § 1983 action alleging unlawful arrest, a plaintiff must demonstrate the absence of probable cause to arrest.  *Schertz*, 875 F.2d at 582 (stating that "the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest").  Because Henriksen's arrest was made pursuant to a facially valid warrant issued by a judicial officer, Defendants violated Henriksen's rights "only if reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place."  *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)); *see also Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000).  To demonstrate that, Henriksen must identify evidence in the record showing that the officers procuring the warrant knowingly or intentionally or with a reckless disregard for the truth made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest.  *Beauchamp*, 320 F.3d at 742.  A reckless disregard for the truth can be established by a showing, *inter alia*, that the officers failed to inform the judicial officer of facts they knew would negate probable cause.  *Id.* at 743.  Probable cause for the arrest warrant existed if, at the time the officers sought the warrant for Henriksen's arrest, the facts and circumstances within the officers' knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent person in believing that Henriksen had committed the crime. *Id.*

In this case, Henriksen has failed to present any evidence that Defendants misled the judge in procuring the arrest warrant. Henriksen has not shown *what* information was provided to the judge to obtain the warrant. Indeed, Henriksen has not even shown that *these individual Defendants*, rather than Sergeant Bricston, who is not a defendant in this case, obtained the warrant. Although Henriksen argues that defendant Shergold fabricated a report regarding Mr. Smith's and Mr. Johnson's statements, the interview and the report were done *after* Henriksen's arrest. (Defs.' LR Ex. Z, Shergold Report.) Henriksen has not shown that any of the facts contained in that report were provided to or relied upon by the judge in determining that there was probable cause for Henriksen's arrest.

Probable cause exists "if at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that a crime had been committed. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (citation omitted). Contrary to what its name might seem to suggest, probable cause "demands even less than 'probability' . . . ; it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (internal and end citations omitted). In addition, "[p]robable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." *Gramenos*, 797 F.2d at 439.

The facts known to the police at the time they sought the arrest warrant were sufficient to establish probable cause. At the time the arrest warrant was obtained, the evidence included Henriksen's prior contacts with the police department seeking to have Ms. Drjanski removed from his house, the lack of any forced entry into the home, Henriksen's call to 911, Henriksen's description of his activities on the day of the murder (including his quitting his job that day), and Mr. Harrison's recorded statement about Henriksen's admissions. (Pl.'s Resp. at 5.) Henriksen argues that Mr. Harrison's statement is "inherently unbelievable." (*Id*.) However, that was an evaluation for the judge who issued the warrant to make. There is no evidence that the statement was fabricated. Henriksen also argues that he provided an alibi for his whereabouts during the time the police "then" believed the murder to occur, and that the alibi was corroborated by the Elgin Police Department. (*Id*.) Apparently, Henriksen is referring to his mother's statement that he was at her home between 5:00 p.m. and 7:45 p.m. (*See* Pl.'s Resp. at 5, citing Harris' deposition at 33-35.) However, Henriksen admits that, although his mother confirmed that he had been at her home for dinner, Beeter was unable to verify with other witnesses Henriksen's "alibi" for the period between noon and 5:00 p.m. (Pl.s' LR Resp. ¶ 14.) The only basis for Henriksen's argument that his mother provided an alibi for the time the police believed the murder to have occurred is Picardi's testimony to the first grand jury that the death was "[r]elatively recent by all indications." (Defs.' LR Ex. G at 4.) That does not demonstrate that there were facts negating probable cause known to Defendants but not disclosed at the time the warrant was obtained. Accordingly, Henriksen has not demonstrated a constitutional violation in connection with his arrest.[16]

---

[16] Because there was probable cause for Henriksen's arrest, the court need not consider Defendants' additional argument that they are entitled to qualified immunity because there was at least "arguable probable cause" for Henriksen's arrest. (Defs.' Am. Mem. at 18-20.)

## C.    Testimony Before the Grand Jury

Henriksen argues that Picardi misled or withheld certain information from the grand juries. (Pl.'s Am. Resp. at 18.) However, a witness has absolute immunity for testimony before grand juries and thus "no § 1983 action can lie against [defendant] for what she said or didn't say to the Grand Jury." *Kompare*, 801 F.2d at 890. Additionally, a grand jury finding of probable cause is an absolute defense to an action for prosecution without probable cause. *Id*. at 891. However, a plaintiff may still have a claim for a due process violation if, as a result of misconduct by the police, the grand jury did not hear evidence that the prosecutor would have been bound to present. *Id*. at 892; *see also Nugent v. Hayes*, 88 F. Supp. 2d 862, 866 (N.D. Ill. 2000) (stating that although generally an indictment by a grand jury is *prima facie* evidence of probable cause, the court would examine probable cause independent of the indictment because plaintiff alleged that the indictment was the result of deceptive action by the defendant police officers).

"A grand jury proceeding 'is not an adversary hearing in which the guilt or innocence of the accused is adjudicated.'" *U.S. v. Lane*, No. 86 C 592, 1991 WL 83470 at *4 (N.D. Ill. May 6, 1991) (Nordberg, J.) (quoting *U.S. v. Calandra*, 414 U.S. 338, 343 (1974)). Thus, the government is only required to submit exculpatory evidence to a grand jury if the evidence "clearly negates" the accused's guilt. *U.S. v. Flomenhoft*, 714 F.2d 708, 712 (7th Cir. 1983) (stating that there is "a big difference between exculpatory evidence and evidence that may be impeaching in some important or unimportant respect" (citation and internal quotations omitted)); *Kompare*, 801 F.2d at 892 (stating that defendant was not required to disclose exculpatory evidence to grand jury which "did not clearly negate [accused's] guilt"); *U.S. v. Gardner*, 860 F.2d 1391, 1395 (7th Cir. 1988).

Henriksen complains that exculpatory evidence was not presented to the grand jury. However, he does not claim that Defendants concealed any information from the prosecutor.[17] (*See* Pl.'s LR Resp. ¶ 20.) The prosecutor decided what questions to ask and what evidence to present to the grand jury. *See Gregory*, 226 F. Supp. 2d at 954 (granting summary judgment to defendant where plaintiff did not show that the officers withheld information from the prosecutor). Although the prosecutor voluntarily dismissed the initial indictment following Harris' motion, there is no indication in the record that the decision resulted from any evidence or circumstances casting doubt on probable cause. The discrepancies cited in Harris' motion do not negate guilt, as demonstrated by the fact that the second grand jury returned an indictment where the discrepancies were corrected.[18] Even Henriksen's attorney in the criminal case could not find any basis to criticize the presentation of evidence to the second grand jury. Henricksen has not demonstrated an actionable constitutional violation in connection with testimony before the grand jury.

_____

[17] Henriksen identifies the following as potentially exculpatory information withheld from the second grand jury: Mr. Potter's observations about the woman who entered the house without a key and Picardi's testimony that there was no indication that anything had been used to open the door other than a key (Pl.'s 2nd Am. Compl. ¶¶ 34, 35; Pl.'s Am. Resp. at 8, 18-19; Defs.' LR Resp. ¶ 25); Picardi's statement that there was "nothing obvious to us" although purple marks were observed on Ms. Drjanski's neck (Pl.'s Am. Resp. at 8, 19; Defs.' LR Resp. ¶ 28); and the fact that Larcker was a four-time convicted felon and drug addict who gave his testimony in exchange for being placed in a drug treatment program (Pl.'s Am. Resp. at 8; Defs.' LR Resp. ¶ 39). All of that information was provided to the prosecutor through police reports filed by the police officers. (Pl.'s LR Resp. ¶ 20.)

[18] For example, although Henriksen argues that Picardi misled the grand jury into believing that there was no indication that anything had been used to open the door other than a key, Picardi advised the second grand jury that the back door had been found ajar. (Second Grand Jury Trans. at 9.) Similarly, although Henriksen argues that Picardi misled the grand jury by stating that there was "nothing obvious to us" in reference to Ms. Drjanski's strangulation, Picardi testified to the second grand jury that there were "some marks on her skin," and that the medical examiner was able to identify signs of strangulation before conducting an internal examination. (*Id*. at 5, 11.)

**D.     Due Process Right to a Fair Trial**

Defendants argue that Henriksen's acquittal extinguishes any claimed violation of his right to a fair trial, because the result of the trial could not have been prejudiced by any wrongdoing. (Defs.' Am. Mem. at 16.)  Although some courts have accepted that argument, *see, e.g., Gregory*, 226 F. Supp. 2d at 953, other courts have rejected it.  *See Carroccia*, 249 F. Supp. 2d at 1023-1024 (finding that if exculpatory evidence was wrongly withheld, plaintiff's acquittal did not eliminate the due process violation that had already occurred by the time of the acquittal).  In any event, this decision is not based on that argument.  Rather, the evidence presented by Henriksen does not demonstrate any constitutional violation.

Henriksen does not claim that any exculpatory evidence was withheld from the defense attorney.  Henriksen's attorney, Harris, was provided copies of the police reports and, in fact, testified that she had obtained "everything" from the prosecutor as far as she knew.  (Pl.'s LR Resp. ¶¶ 32, 50; Defs.' LR Ex. V, Harris Dep. 8/20/04 at 13-14, 16-22, 46-47, 65.)  Henriksen suggests instead that Defendants fabricated evidence and failed to conduct a reasonable investigation, allegedly because they had decided to pin the murder of Ms. Drjanski on Henriksen, a mentally disabled person.

**1.     Fabrication of Incriminating Evidence**

Defendants do not dispute that fabricating material incriminating evidence is a constitutional violation for which police officers may be liable.  *See e.g.*, *Gauger v. Hendle*, 249 F.3d 354, 358 (7th Cir. 2003) (citing "the many decisions which hold that if police falsify their reports in a successful effort to persuade the prosecutors to prosecute a suspect, they have violated his civil rights and he

can sue the police without worrying about immunity").

Henriksen claims that defendant Shergold fabricated the statements in his police report attributed to Mr. Smith to the effect that Henriksen had been in a jealous rage, had a gun, and had threatened to kill Ms. Drjanski's new boyfriend, and that Shergold fabricated the statement attributed to Mr. Johnson that Henriksen looked like he was going to "gang tackle" his boss just before he resigned from his job on the day of the murder. (Pl.'s Am. Resp. at 20-22.) Henriksen argues that if the prosecutor had been aware that Shergold had fabricated those reports, the prosecutor may not have gone forward with the prosecution. (*Id*. at 22.)

However, there is *no evidence* to support Henriksen's contention that the report containing Johnson's statement was "fabricated." Henriksen merely relies on the fact that Johnson did not testify about the "gang tackle" comment at Henriksen's trial, and that one of the police reports discussing Johnson did not contain that account. (*Id*. at 21.)[19] That is not evidence that Shergold fabricated the report. Indeed, there could be many reasons why Mr. Johnson did not testify about at trial about specific pieces of information in the report. Henriksen's argument that Shergold fabricated the statements attributed to Johnson is nothing more than speculation.

Smith, on the other hand, stated at his deposition in October 2003, six years after the events and almost a year after Henriksen filed this lawsuit, that he never made several of the statements attributed to him in Shergold's report. Specifically, Mr. Smith testified at his 2003 deposition that Henriksen came to him for pastoral counseling, and expressed concern over the fact that Ms. Drjanski was acting strangely and might have gotten involved in drugs and prostitution. (Defs.' LR

---

[19] Also, Mr. Johnson's allegedly fabricated statement was not mentioned in the evidence before either grand jury proceeding. (*See* Defs.' LR Ex. G, First Grand Jury Trans.; Defs.' LR Ex. J, Second Grand Jury Trans.)

Resp. ¶¶ 54, 61.) But Mr. Smith testified that he did not remember Henriksen telling him that he was in love with Ms. Drjanski, that she had a boyfriend, that he had seen her with another man and would kill the guy if he ever caught him, or that he had a gun. Smith testified that he had never reported such statements to the police. (Defs.' LR Resp. ¶¶ 54, 57, 58; Pl.'s LR Ex. K, Smith Dep. at 29, 35, 61-62, 66-67, 69.) Of course, Mr. Smith's deposition testimony does not establish that the report was actually fabricated; as even Henriksen acknowledges, Mr. Smith could have made the statements to Shergold and then for unknown reasons decided to recant them later. However, for purposes of summary judgment, Henriksen has provided some evidence to support his contention that Shergold fabricated the part of his report involving Smith's statement. But Henriksen has not provided any evidence that the information was material to a violation of his due process right. As discussed above, the arrest warrant had already been issued when Shergold interviewed Mr. Smith. Henriksen has presented no evidence indicating that the prosecutor would have dropped the charges had he known that Mr. Smith's comments were fabricated, and there is no reason to believe that the charges would have been dropped. Henriksen admits that the information in Shergold's report was not presented to either grand jury or at trial. (Pl.'s LR Resp. ¶ 28; Defs.' LR Ex. V, 8/20/04 Harris Dep. at 87; Defs.' LR Ex. G, First Grand Jury Trans; Defs.' LR Ex. J, Second Grand Jury Trans.) Thus, there is no evidence that the report, even if fabricated, had any effect on Henriksen's continued confinement or the outcome of the trial. Accordingly, Henriksen has not presented evidence that Shergold's report constituted a violation of Henriksen's due process right to a fair trial.

### 2. Defendants' Investigation

Last, Henriksen argues that Defendants had a duty to continue their investigation for another

suspect, such as Ms. Drjanski's estranged husband, one of the men listed in Ms. Drjanski's address book, or Daniel Fluellen (the other tenant in the house). (Pl.'s Am. Resp. at 9, 16.) In support of his argument, Henriksen claims that at the time Defendants applied for a warrant, they had not received any incriminating statements from any reasonably believable witness, because Mr. Harrison was their only witness and he was not reasonable believable. (*Id*. at 9-15.) Henriksen argues that Mr. Harrison was an obvious alcoholic and displayed very strange behavior around the time of the events, such as calling 911 and complaining that someone might be having a "physical problem" after being told that his daughter was dead, failing to drive to Henriksen's home on the night of the murder, expressing sympathy to Henriksen the following day for what he had to "go through" with his daughter, making the "unlikely" report that Henriksen had admitted to committing the crime, and planning to pick up clothes from Henriksen's house two days after supposedly learning that Henriksen had murdered his daughter. (*Id*. at 11-12). Henriksen states that even Picardi acknowledged at his deposition that Mr. Harrison was not a "normal" person. (*Id*. at 12.) Henriksen argues that a reasonably well-trained officer would have seriously questioned the reliability of Mr. Harrison's statement and would have proceeded further with the investigation. (*Id*. at 15.)

There are many problems with Henriksen's argument. To start, the police did not rely solely on Mr. Harrison's statement, and did proceed further with the investigation, as discussed above. The police officers had probable cause to arrest Henriksen and continue to detain him based on a number of facts and circumstances, of which Mr. Harrison's statement was only one. Although Henriksen claims that Mr. Harrison was not reliable, his statement was supported by the objective evidence of the telephone records, which Defendants obtained from Ameritech, showing phone calls from

Henriksen at the times that Mr. Harrison reported to the police.[20]  The police were not required to ignore Mr. Harrison's statement regarding Henriksen's admission.  *See Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 2000) (stating that a witness' report need not be unfailingly consistent to provide probable cause, as that question is for the jury, not police).

Henriksen has not demonstrated a constitutional violation under the  the authorities discussed above.  *See Carroccia*, 249 F. Supp. 2d at 1025 (dismissing plaintiff's claim under § 1983 that defendants failed to pursue credible investigative leads).  Defendants were also not required to test items such as cigarette butts, dust for fingerprints or seize specific evidence in the manner Henriksen would have liked.  *See Gerald M.*, 858 F.2d at 381; *Schertz*, 875 F.2d at 583; *Gramenos*, 797 F.2d at 442; *Carroccia*, 249 F. Supp. 2d at 1025.

## II.     Conspiracy Claim

Count IV of Henriksen's Second Amended Complaint alleges a conspiracy to violate his constitutional rights.  (Pl.'s 2nd Am. Compl. ¶¶ 74-76.)

With respect to a conspiracy claim, the Seventh Circuit in *Alexander* stated that a plaintiff must show:

> that an actual conspiracy existed (in other words, that people agreed to injure him), that its purpose was to deprive [the plaintiff] of his constitutional rights, that an act was committed in furtherance of the conspiracy, and that he was injured. . . .  A conspiratorial agreement may be established by circumstantial evidence, but only if a reasonable jury could conclude that the conspirators had, in fact, reached an understanding that they sought to injure [the plaintiff].

---

[20]At Henriksen's criminal trial, the prosecution and defense stipulated that an Ameritech employee would testify that in January and February 1997, he was asked to check the phone records to verify the phone calls, and did so.  (Defs.' LR Ex. AA.)

433 F.3d at 557.

In this case, Henriksen has failed to present evidence that would allow a reasonable jury to conclude that there was a conspiracy to violate his constitutional rights. To the extent that he argues this point in his response to Defendants' motion, it is just speculation. He leaps from his argument that Defendants failed to investigate all possible leads to a conclusion that Defendants "deliberately chose to incriminate a man who was mentally disabled." (Pl.'s Resp. at 17.) He has presented no evidence, either direct or circumstantial, that would permit a reasonable jury to conclude that Defendants had reached a conspiratorial agreement to violate his constitutional rights. Accordingly, he has no claim under § 1983 for conspiracy.

## III. The City's Liability

To establish municipal liability under § 1983, Henriksen must prove that a "custom or policy of the City was a cause of the plaintiff's injury." *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). Because Henriksen has failed to produce evidence of a constitutional violation, his claim against the City of Elgin under § 1983 also fails. *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003).

## IV. Henriksen's State Law Claims

Defendants argue that if summary judgment is granted on Henriksen's § 1983 claim, the court should exercise its discretion pursuant to 28 U.S.C. § 1367(c) to dismiss the remaining state law claims without prejudice for lack of jurisdiction. (Defs.' Am. Mem. at 20-21.) That section permits the court to decline to exercise jurisdiction over a supplemental claim when the court has dismissed

all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). In this case, Henriksen's claim of deliberate indifference to his medical needs remains pending, although that claim is against different defendants, the Kane County Sheriff's Office and Correctional Medical Service, Inc., who are not defendants in the supplemental state claims. The parties have not addressed the issue of whether the court can decline to exercise supplemental jurisdiction in such a situation.

Defendants also argue that the state law claims should also be dismissed because the claims were not filed within the time required by the applicable statute of limitations. (*Id.* at 21.) In response, Henriksen argues that the statute should be tolled pursuant to 735 Ill. Comp. Stat. § 5/13-211 because he was under a legal disability. (Pl.'s Am. Resp. at 26.) In support, he submits an affidavit from his psychiatrist, Richard Abrams, opining that Henriksen was incompetent to file a lawsuit within one year of his acquittal on the criminal charges because of "acute and chronic mental incompetence." (Pl.'s LR Ex. W, Aff. Richard Abrams ¶ 12.) Defendants do not submit any medical evidence in opposition to Dr. Abrams' opinion, but argue that Henriksen was competent at the time his claims accrued, which they argue was at the time of his arrest. (Defs.' Reply at 18.)

Summary judgment on Henriksen's state law claims is not appropriate at this point. The first step in evaluating arguments about whether a claim was filed within the statute of limitations or if the statute was tolled is determining when the claim accrued. The parties have not adequately addressed the issue of when Henriksen's state law claims accrued. In this case, where a number of claims are made, the claims may have accrued at different times. Any further briefing on this issue must address the recent decision by the Seventh Circuit, *Evans v. City of Chicago*, — F.3d —, 2006 WL 29209 (7th Cir. Jan. 6, 2006).

Defendants' memorandum also lists a number of other arguments why summary judgment

should be granted on the state law claims. (Defs.' Am. Mem. at 22-23.) Those arguments are not developed, and the court declines to expand upon Defendants' sparse presentation. Accordingly, Defendants' motion for summary judgment on the state law claims is denied without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part without prejudice. Judgment is entered against plaintiff Bruce Henriksen and in favor of defendants Thomas Shergold, Robert Beeter, Ronald Spejcher, James Picardi and the City of Elgin as to Count I (violation of 42 U.S.C. § 1983), and Count IV (conspiracy) to the extent that Count IV claims conspiracy to violate plaintiff's constitutional rights. In all other respects the motion is denied without prejudice.

**IT IS SO ORDERED**.

_____
Geraldine Soat Brown
United States Magistrate Judge

February 7, 2006